**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| CARL D. DEKLE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION 15-0069-WS-C |
| ) | |
| GLOBAL DIGITAL SOLUTIONS, ) | |
| INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

This matter comes before the Court on Defendants' Motion to Dismiss Second Amended Complaint (doc. 35). The Motion has been briefed and is ripe for disposition.

**I.    Relevant Background.**

This action is a commercial dispute arising from the sale of the business interests of plaintiffs, Brian A. Dekle ("Dekle")[1] and John Ramsay, in a company called North American Custom Specialty Vehicles, LLC ("Old NACSV") to defendants in June 2014. Plaintiffs' claims fall into two categories. First, plaintiffs maintain that defendants breached the Equity Purchase Agreement effectuating the sale of Old NACSV by (i) failing and refusing to pay certain cash consideration to plaintiffs upon the post-closing sale of certain assets; and (ii) failing to use commercially reasonable efforts to operate the acquired company on a profitable basis and consistent with historical practices (which purportedly damaged plaintiffs because defendants were obligated to pay additional consideration to plaintiffs based on the company's post-closing performance). Second, plaintiffs bring federal and state claims of securities fraud, alleging that defendants made false and deceptive statements to induce Dekle and Ramsay to accept a portion of their compensation for the transaction in the form of newly-issued stock for defendant Global

---

[1] Brian Dekle passed away on June 2, 2015. By Order (doc. 48) entered on August 19, 2015, Carl D. Dekle, as Personal Representative of the Estate of Brian A. Dekle, was substituted as a party plaintiff herein.

Digital Solutions, Inc. ("GDSI"), rather than in cash (as plaintiffs had originally requested). This latter category of claims is the focal point of the pending Motion to Dismiss.

Defendants moved for dismissal of plaintiffs' First Amended Complaint on a plethora of grounds, many of them targeted specifically at the securities fraud claims asserted as Counts Three and Four. In the ensuing briefing on that motion to dismiss, plaintiffs volunteered to replead their securities fraud causes of action to correct any pleading deficiencies that might exist. On June 5, 2015, the undersigned entered an Order (doc. 29) concluding that the First Amended Complaint was inadequately pleaded in several respects. In particular, the June 5 Order indicated that plaintiffs had failed to provide the requisite "specific allegations explaining who made the representation, when it was made, and why it was false or misleading." (Doc. 29, at 13.) The June 5 Order further deemed Counts Three and Four not to satisfy the "legal requirement that plaintiffs asserting a securities fraud claim must plead with particularity facts establishing scienter as to each allegedly fraudulent representation." (*Id.* at 14.) Finally, the June 5 Order determined that the First Amended Complaint failed to plead the necessary element of loss causation, which in securities fraud cases requires "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." (*Id.*) Notwithstanding these defects, plaintiffs were authorized to file an amended, corrective pleading.

In the wake of the June 5 Order, plaintiffs timely filed their Second Amended Complaint (doc. 33). Defendants renewed their Motion to Dismiss (doc. 35), taking aim at Counts Three and Four on grounds that such claims fail to allege actionable material misrepresentations, scienter, reasonable reliance by plaintiff Ramsay, or loss causation. By contrast, plaintiffs' position is that the Second Amended Complaint satisfies all pleading requirements for securities fraud claims under applicable law.

**II.     Analysis.**

     ***A.     Plaintiffs Have Alleged Actionable Material Misrepresentations.***

The Second Amended Complaint identifies at least a half-dozen misrepresentations that lie at the heart of plaintiffs' securities fraud claims, to-wit: (i) defendant Richard Sullivan's statement "that he had the connections, capital, and other pieces in place to build a turn key conglomerate military and law enforcement support business" (doc. 33, ¶ 14); (ii) defendants' statement that GDSI was adding to its Board of Directors a descendant of King Leopold II whose presence, connections and involvement "would enable GDSI to complete the purchase of

Remington Outdoor Supply Company" (*id.*, ¶ 16); (iii) defendant Sullivan's statement that GDSI "was buying Lawmen's Safety Supply of North Carolina" (*id.*, ¶ 19(A)); (iv) defendant Sullivan's statement that GDSI "would fund NACSV's production so that operating capital would be a non-issue" (*id.*, ¶ 19(B )); (v) defendant Sullivan's statement that GDSI "would fund NACSV's marketing" (*id.*, ¶ 19(C)); and (vi) defendant Sullivan's statement that GDSI "would purchase a 56,000 square foot facility to enable NACSV to produce command centers" at high volume (*id.*, ¶ 19(D)).

Defendants object that these alleged misrepresentations are not actionable as securities fraud because the Second Amended Complaint casts them as mere statements of opinion, without providing factual allegations demonstrating their objective and subjective falsity. Under federal securities law, "opinions, predictions and other forward-looking statements … may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them." *In re Donald J. Trump Casino Securities Litigation – Taj Mahal Litigation*, 7 F.3d 357, 368 (3rd Cir. 1993) (citations omitted).[2] However, the Second Amended Complaint includes sufficient factual allegations to meet this standard for pleading purposes. For example, plaintiffs allege that various misrepresentations by defendant Sullivan (*i.e.*, that GDSI would buy Lawmen's Safety Supply of North Carolina, that GDSI would purchase a 56,000 square-foot production facility) were objectively and subjectively false because GDSI lacked the financial means to make such purchases, and Sullivan knew this to be so at the time he made these statements. And the alleged misrepresentation concerning King Leopold II's descendant is not pleaded as a statement of opinion at all, but rather as a statement of fact that defendants were sharing with plaintiffs in private, antecedent to "an upcoming public announcement" that this individual was actually joining the GDSI Board of Directors. (Doc. 33, ¶ 16.) The clear inference from the pleading is

---

[2] *See also In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 470 (6th Cir. 2014) (plaintiff pursuing securities fraud claim based on "soft information" such as a statement of opinion must "plead facts showing that the statement was made with knowledge of its falsity") (citation omitted); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3rd Cir. 2014) ("Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis."); *Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014) (explaining that a statement of belief is actionable under federal securities laws if "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy") (citations omitted).

that this new Board member was identified to plaintiffs as a *fait accompli*, when in fact no such arrangement had been reached and this prominent individual never joined GDSI's Board. In short, after careful review of plaintiffs' factual allegations, the Court concludes that the Second Amended Complaint adequately pleads actionable misrepresentations under federal securities laws.[3]

### B. Plaintiffs Have Adequately Alleged Scienter.

To satisfy the scienter element of a § 10(b) claim, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) (citing 15 U.S.C. § 78u-4(b)(2)). In the Eleventh Circuit, that required state of mind entails "a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness." *Id.* at 634; *see also FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) ("Rule 10b-5 requires a plaintiff to show that the defendant made the material misstatement or omission with the requisite culpable state of mind, or scienter," which is "intent to defraud or severe recklessness") (citation omitted). To determine the sufficiency of a pleading's scienter allegations, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *FindWhat*, 658 F.3d at 1300 (citations omitted).

---

[3] In so determining, the Court considers and rejects defendants' argument that the alleged misrepresentations lack particularity because they fail to identify the specific plaintiff to which each statement was made. (Doc. 35, at 11.) Defendants cite no authority for such a pleading requirement, and the Court is aware of none. *See FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (enumerating pleading requirements for misrepresentations in securities fraud context, but omitting mention of any necessity that the audience or recipient of the alleged misrepresentation be pleaded with particularity). Moreover, it appears to make no difference for securities fraud liability whether both plaintiffs were the direct recipients of the alleged misrepresentations, or whether those statements were made to one plaintiff or other (or to their legal representative or agent). In other words, it would appear that Dekle's claims for securities fraud would be equally valid whether the alleged fraudulent statements were made to him directly, to his lawyer, or to his business partner. The same is true of plaintiff Ramsay. Either way, plaintiffs' pleading reflects that they were aware of and relied on defendants' misrepresentations (known by defendants to be false) that induced them to accept GDSI stock in the Old NACSV transaction when they otherwise would not have done so.

Defendants argue that the Second Amended Complaint flunks the scienter requirement because it lacks "any credible allegations regarding GDSI's or Sullivan's supposed motives." (Doc. 35, at 13.) After careful examination of the Second Amended Complaint taken as a whole, the Court disagrees. Plaintiffs' pleading alleges that Dekle wanted the sale of Old NACSV to be an all-cash deal, but that defendants "attempted to induce, and later succeeded in inducing, Plaintiffs to accept newly-issued GDSI stock as part consideration." (Doc. 33, ¶ 12.) To do so, the Second Amended Complaint alleges, defendant Sullivan deceived Dekle with grandiose assurances of GDSI's financial abilities and standing, all the while knowing that GDSI's "so-called business plan was nothing but smoke and mirrors." (*Id.*, ¶ 13.) The well-pleaded facts relating to the specific alleged misrepresentations and defendants' knowledge of their falsity corroborate the inference that defendants acted with intent to defraud plaintiffs (*i.e.*, with the requisite scienter).

Nowhere is this inference clearer than with respect to the misrepresentation concerning King Leopold II's descendant becoming a GDSI board member. The well-pleaded allegations of the Second Amended Complaint reflect that this statement was made during a conference call in which GDSI and Sullivan were endeavoring to persuade plaintiffs to accept GDSI stock as partial compensation for the sale of Old NACSV; that this "private announcement" was false; that defendants knew it to be so; that defendants told plaintiffs a public announcement was imminent (it was not); and that defendants encouraged plaintiffs to accept GDSI stock because of the "stock price bump" that would occur when the public announcement was made. (Doc. 33, ¶ 16.) These allegations, taken in the context of all other allegations in the Second Amended Complaint, raise an inference that defendants were knowingly lying to plaintiffs to try to trick them into accepting GDSI stock as part of the payment for the sale of Old NACSV. That inference is at least as strong as any opposing inference; therefore, the element of scienter is adequately pleaded in the Second Amended Complaint.[4]

---

[4] Two points in defendants' Reply warrant further discussion. First, defendants insist that merely alleging that defendant Sullivan knew GDSI lacked the financial ability to engage in some of the activities he told plaintiffs were in the offing is not probative of scienter. Rather, defendants assert that plaintiffs must plead facts "explaining why GDSI did not have the financial ability to implement expansion plans, and why and how Sullivan would have been aware of that information." (Doc. 49, at 5-6.) Financial ability or inability is a provable fact. It is not necessary for plaintiffs to plead or prove the reasons for any such financial inability on
(Continued)

C.  *Plaintiffs Have Adequately Alleged Reliance by Ramsay.*

Defendants next call into question the sufficiency of the Second Amended Complaint's allegations concerning reliance. This argument centers on plaintiff Ramsay, as defendants maintain that "[p]laintiffs have failed to allege any such reliance on these statements by Ramsay." (Doc. 35, at 14.)

It is a correct statement of law that reliance is an element of plaintiffs' securities fraud claims. *See, e.g., Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013) ("a plaintiff in a § 10(b) suit must demonstrate reliance – that is, that he or she actually relied upon the alleged misrepresentation"). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction – e.g., purchasing common stock – based on that specific misrepresentation." *Id.* (citation

---

GDSI's part. If (as plaintiffs have alleged) GDSI promised plaintiffs that it was going to do certain things it knew it was financially incapable of doing, then that is evidence of scienter. As for Sullivan's awareness, the Second Amended Complaint alleges that he "is, and was at all times pertinent hereto, President, CEO, and Chairman of the Board of Defendant GDSI and was in a position to, and did control, GDSI." (Doc. 33, ¶ 4.) Defendants apparently contend that no reasonable person could infer that a company's controlling executive would have knowledge of the company's financial constraints. Such an argument is unpersuasive at the pleadings stage. To the contrary, a reasonable (and, indeed, strong) inference may be drawn from the Second Amended Complaint that GDSI's President, CEO and Chairman of the Board would be keenly aware of the company's financial status and inability to engage in the bombastic expansion plans he was describing to entice plaintiffs to accept company stock as compensation. Second, defendants' argument in the Reply that "Plaintiffs have simply alleged no personal motive for Richard Sullivan to commit securities fraud" (doc. 49, at 7) misses the mark. The Second Amended Complaint reflects that GDSI (of which Sullivan was President, CEO and Chairman) was purchasing Old NACSV from plaintiffs, who wanted an all-cash deal. Convincing plaintiffs to accept purportedly worthless GDSI stock in lieu of some of the cash would enable GDSI (Sullivan's company) to save money on the transaction. The allegations of motive are clear. To be sure, defendants are free to vigorously contest those allegations as this case moves forward. What they cannot successfully do at the pleadings stage, however, is argue that those allegations are so farfetched that they do not adequately plead scienter. Besides, plaintiffs were certainly not required to plead that Sullivan had some "personal motive" for the alleged fraud separate and apart from the anticipated benefit to the company he heads and controls. Defendants identify no case authority supporting the proposition that scienter cannot be established absent proof that the particular defendant stood to profit personally from the deception. A person can intend to defraud someone else even if the direct financial beneficiary of the fraud will be that person's company, rather than the person himself or herself.

omitted). The current iteration of plaintiffs' complaint adequately pleads that form of reliance with regard to plaintiff Ramsay. The Second Amended Complaint identifies the alleged misrepresentations made by defendants, indicates that "Plaintiffs did not realize the fraudulent nature or falsity of these representations," and alleges that "[t]he misrepresentations caused the Plaintiffs to accept stock rather than cash as partial payment of the purchase price." (Doc. 33, ¶ 20.) Such allegations are facially adequate to plead reliance. A fair reading of the Second Amended Complaint is that plaintiff Ramsay was aware of the misrepresentations, that he did not know they were false, and that he accepted GDSI stock as partial payment for the sale of Old NACSV in reliance on same.[5] The reliance element is satisfactorily pleaded.

### D. Plaintiffs Have Adequately Alleged Loss Causation.

Defendants' final incursion against the securities fraud claims pleaded in the Second Amended Complaint relates to loss causation. "The loss causation element of a Rule 10b-5 claim requires that the defendant's fraud be **both the but-for and proximate cause** of the plaintiff's later losses." *FindWhat*, 658 F.3d at 1309 (emphasis added). Thus, "[t]he plaintiff must show that the defendant's fraud – as opposed to some other factor – proximately caused his claimed losses." *Id.* This concept is distinct from reliance or transactional causation (*i.e.*, that plaintiffs would not have accepted GDSI stock shares as payment absent the alleged fraud). In the words of the Eleventh Circuit, "[w]hile reliance focuses on the front-end causation question of whether the defendant's fraud induced or influenced the plaintiff's stock purchase, loss causation provides the bridge between reliance and actual damages." *Id.* at 1311 (citation and internal quotation marks omitted). Simply put, then, the loss causation element requires proof of

---

[5] Defendants' reliance argument for dismissal of the Second Amended Complaint appears to reformulate their contention that the pleading fails to state a claim unless it identifies misrepresentations communicated directly to plaintiff Ramsay, rather than his business partner or his lawyer. Again, defendants have identified neither legal authority nor persuasive reasoning to support the proposition that a plaintiff cannot assert viable securities fraud claims unless the challenged misrepresentations were made to him directly, much less that some kind of heightened pleading requirement attaches in that scenario. The Second Amended Complaint alleges that defendants repeatedly, intentionally lied to Dekle and plaintiffs' counsel to trick plaintiffs into accepting GDSI stock as part of the purchase price, and that plaintiffs relied on those misrepresentations in agreeing to do so. Defendants have not shown such allegations to be legally inadequate with regard to either the misrepresentation or the reliance elements of a securities fraud claim under federal or Alabama law.

"a causal connection between the misrepresentation and the investment's subsequent decline in value." *Meyer*, 710 F.3d at 1195.[6]

The Second Amended Complaint directly alleges that the alleged misrepresentations were the but-for cause of plaintiffs' losses (*i.e.*, that Dekle and Ramsay never would have accepted GDSI stock at all if not for defendants' lies and deception). (Doc. 33, ¶¶ 20-21.) The pleading further alleges that the GDSI stock price fell from $0.35 per share to $0.04 per share. (*Id.*, ¶ 27.) In accordance with the *FindWhat* / *Meyer* line of authorities, the loss causation element requires plaintiffs to plead and prove a causal connection between the complained-of misrepresentations and the GDSI stock price decline. Defendants' position is that plaintiffs have failed to do so.

In their Response, plaintiffs point to allegations of but-for causation (which is analytically distinct from loss causation, as shown above) and allegations that GDSI failed to use commercially reasonable efforts to run New NACSV (the acquired company) and repudiated the purchase agreement (both of which are inapposite to whether there is a causal link between the alleged misrepresentations and the ensuing collapse of GDSI's stock price). (Doc. 47, at 7-8.) These arguments misapply the concept of loss causation in the securities fraud context. Again, what is relevant (and what plaintiffs must prove) as to the loss causation element is that defendants' misrepresentations were causally connected to the decline of GDSI's stock price, not whether (i) plaintiffs relied on the misrepresentations in agreeing to accept GDSI shares as payment or (ii) GDSI operated the acquired business poorly. *See, e.g., Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) ("Ultimately, a securities fraud plaintiff must prove that the defendant's misrepresentation was a 'substantial cause' of his or her financial loss.");

---

[6] Loss causation provides an integral check and balance to the securities fraud statutory scheme. After all, the purpose of securities statutes is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *see also Meyer*, 710 F.3d at 1196 ("[T]hough § 10(b) is designed to protect against fraud, it is not a prophylaxis against the normal risks attendant to speculation and investment in the financial markets, and loss causation therefore ensures that private securities actions remain a scalpel for defending against the former, while not becoming a meat axe exploited to achieve the latter."). In a nutshell, then, the loss causation element "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).

*Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 97 (1st Cir. 2014) (loss causation requires shareholders "to show a connection between CSFB's deceptive practices and the drop in AOL's stock price").

Notwithstanding the foregoing, the undersigned's reading of the Second Amended Complaint confirms that loss causation is adequately pleaded therein. There are multiple avenues for establishing loss causation in securities fraud cases. One method is by alleging that "when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Public Employees Retirement System of Mississippi, Puerto Rico Teachers Retirement System v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014); *Damian v. Montgomery County Bankshares, Inc.*, 981 F. Supp.2d 1368, 1383 (N.D. Ga. 2013) (loss causation may be satisfied by allegations "that the share price of the security at issue fell significantly after the truth became known"). The Second Amended Complaint advances just such a theory of loss causation. Indeed, this pleading alleges the following: (i) the decline in GDSI's stock price resulted when "GDSI's and Sullivan's misleading, fraudulent or other wrongful statements [were] discovered by the market" (doc. 33, ¶ 8); (ii) GDI's stock price "collapsed when the market realized that GDSI's business plan was a sham" (*id.*, ¶ 18); and (iii) "Plaintiffs had seen their stock value decline from $0.35 per share to $0.04 per share and otherwise realized that they had been defrauded into accepting stock in a failing business" (*id.*, ¶ 27). Thus, plaintiffs' theory, as articulated in the Second Amended Complaint, is that defendants made various misrepresentations to them concealing that GDSI's business plan was "smoke and mirrors" and that the company was "failing." When the marketplace discovered the truth (*i.e.*, that GDSI's business plan was a "sham" and that the business was "failing"), plaintiffs allege, the stock price fell precipitously. These allegations supply the requisite causal connection between the purported misrepresentations and plaintiffs' economic losses, so as to satisfy the loss causation element.

In their Reply, defendants contend that such allegations fail to plead loss causation because "Plaintiffs do not provide any concrete explanations as to how these representations had any effect on the stock price." (Doc. 49, at 10.) Defendants overstate the pleading burden for loss causation in securities fraud cases. In discussing this burden, the Supreme Court opined that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a

defendant with some indication of the loss and the causal connection." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).  Appellate courts have generally not imposed any heightened pleading requirement as to loss causation, but have instead deemed it sufficient for a plaintiff to allege that the share price fell when the truth became known.  *See, e.g., Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 687 (5th Cir. 2014) ("the Supreme Court explicitly declined to address whether any heightened pleading requirement applies to" loss causation element, and statute "does not indicate that it imposes any heightened standard, or make any mention of a 'particularity' requirement with respect to loss causation"); *Loos*, 762 F.3d at 887 ("[a]t the pleading stage … the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," such as by alleging that "the market learned of and reacted to the fraud") (citations and internal marks omitted); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053 (9th Cir. 2011) ("A plaintiff can plead loss causation by alleging that the share price fell significantly after the truth became known, or by alleging that the content of the omissions caused his or her loss.").  By alleging that GDSI's stock price fell after the market became aware of the truth concerning the state of GDSI's business, plaintiffs have adequately pleaded loss causation.  Accordingly, the Second Amended Complaint withstands defendants' Rule 12(b)(6) challenge with respect to loss causation.[7]

---

[7] That said, plaintiffs may face a difficult task in proving (as opposed to pleading) loss causation.  At trial, plaintiffs must show that the economic losses of which they complain (*i.e.*, the plummeting value of their GDSI stock shares) "were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price."  *Bricklayers and Trowel Trades*, 752 F.3d at 95 (citation omitted); *see also Dura*, 544 U.S. at 343 (lower stock price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"); *FindWhat*, 658 F.3d at 1310 ("The plaintiff must show that the defendant's fraud – as opposed to some other factor – proximately caused his claimed losses."); *Ray*, 482 F.3d at 994-95 ("If the plaintiff cannot prove 'loss causation' – that is, the fact that the defendant's actions had something to do with the drop in value – then the claim must fail.").  In the absence of corrective disclosures (which are not alleged to have been made), plaintiffs may be hard-pressed to demonstrate how and when the marketplace became aware of the "relevant truth," and to show that the decline in GDSI's stock price was caused by such a revelation, as opposed to more general market forces.  However, these questions of proof are properly reserved for another day. (Continued)

**III.    Conclusion.**

For all of the foregoing reasons, Defendants' Motion to Dismiss Second Amended Complaint (doc. 35) is **denied**.  Defendants are **ordered** to file their Answer(s) to the Second Amended Complaint on or before **September 28, 2015**.

DONE and ORDERED this 14th day of September, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

For now, it suffices to find – as the Court does – that plaintiffs have adequately alleged loss causation to defeat defendants' Rule 12(b)(6) Motion.

-11-